IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

UNITED STATES OF AMERICA,

v.  No. 08-cr-10097

JERRY L. MILLER,

    Defendant.

_____

ORDER DENYING MOTION TO DISMISS INDICTMENT
_____

On May 23, 2008, a federal grand jury indicted the Defendant, Jerry L. Miller, on one count of being a felon in possession of a firearm. 18 U.S.C. § 922(g). This charge arose from a police search of Miller's residence, which uncovered a Keystone Sporting Arms .22 caliber rifle. The Defendant has filed a motion to dismiss the indictment, alleging that § 922(g) violates his right to bear arms under the Second Amendment, the Due Process Clause in the Fifth Amendment, and the Equal Protection Clause in the Fourteenth Amendment. After due consideration of the arguments presented by the Defendant and the Government, the Court DENIES the motion.

ANALYSIS

    I.    <u>The Second Amendment and Recent Supreme Court Case Law</u>

The Defendant's motion amounts to a constitutional challenge to the federal statute prohibiting firearm possession by felons. He claims a violation of his right under the United States Constitution to have a firearm in his home to defend himself and his family. His argument

1

principally relies on the recent decision of the United States Supreme Court in <u>District of Columbia v. Heller</u>, __ U.S. __, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), which struck down a Washington D.C. law criminalizing the possession of handguns by private citizens. (Docket Entry ("D.E.") No. 23, Mot. to Dismiss, at 2.) This ruling was grounded in the Second Amendment of the United States Constitution, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The <u>Heller</u> Court held that this provision of the Bill of Rights codified "the individual right to possess and carry weapons in case of confrontation." <u>Heller</u>, 128 S. Ct. at 2797. Considering the historical context of the Second Amendment, the Court explained that

> it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed." As we said in <u>United States v. Cruikshank</u>, 92 U.S. 542, 553, 23 L. Ed. 588 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second amendment declares that it shall not be infringed . . . ."

<u>Id.</u> at 2798-99. The Court also indicated that the right to bear arms was particularly strong in the context of the home, "where the need for defense of self, family, and property is most acute." <u>Id.</u> at 2817.

The statute challenged by Miller states, in part:[1]

> It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

---

[1] In addition to felons, § 922(g) criminalizes possession of a firearm by eight other classes of persons.

2

18 U.S.C. § 922(g).[2] The Defendant argues that, per Heller, the statute's blanket "prohibition against a felon possessing a firearm is an unconstitutional abridgment of [his] fundamental rights." (D.E. 3, Mot. to Dismiss, at 3.)

Miller recognizes, however, that a significant hurdle to his argument was created by Justice Antonin Scalia, the author of Heller, when he included the following language in his opinion:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

128 S. Ct. at 2816-17 (emphasis added). As has been recognized by numerous lower courts,[3] the clear import of Justice Scalia's statement is a direct refutation of the Defendant's position. See e.g., United States v. Schultz, No. 1:08-CR-75-TS, 2009 U.S. Dist. LEXIS 234, 2009 WL 35225, at *2 (N.D. Ind. Jan. 5, 2009) (stating, in a case involving a felon in possession of a firearm, that "[t]here is no wiggle room to distinguish the present case from the Supreme Court's blanket statement"). Miller attempts to explain away the Supreme Court's clear instruction by labeling it as "unsupported

---

[2]The statute makes exceptions for felons convicted of "any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921.

[3]Professor Adam Winkler has noted that, as of early 2009, there have been sixty cases in which gun control laws have been upheld, despite Heller, and none striking down a gun regulation. Adam Winkler, The New Second Amendment: A Bark Worse Than Its Right, Huffington Post, http://www.huffingtonpost.com/adam-winkler/the-new-second-amendment (last visited Feb. 10, 2009). He also noted that Justice Scalia's statement, as to the types of regulations not called into question by the opinion, "revealed that the Supreme Court believes that almost all gun control measures on the books today are perfectly lawful–a message that hasn't been lost on the lower courts." Id.

3

dicta"[4] that is non-binding as to the issue before this Court. (D.E. 3, Mot. to Dismiss, at 3.)

Black's Law Dictionary defines "dicta"[5] as:

> Opinions of a judge which do not embody the resolution or determination of the specific case before the court. Expressions in [a] court's opinion which go beyond the facts before [the] court and therefore are [the] individual views of [the] author of [the] opinion and not binding in subsequent cases as legal precedent.

Black's Law Dictionary 454 (6th ed. 1990). Under the facts of Heller, the plaintiff was a special police officer who had been denied a registration certificate for his handgun. 128 S. Ct. at 2788. He sought injunctive relief against enforcement of Washington D.C. laws that prevented him from possessing a functional handgun in his home. Id. Unlike the Defendant in this case, Heller was not a felon, nor did he fall into any of the classifications listed in 18 U.S.C. § 922(g), and the firearm regulations at issue applied indiscriminately to all citizens, with some exceptions for law enforcement officials. Id. Also, when the Supreme Court granted the writ of certiorari in Heller, it specifically limited the question of review to

---

[4] Miller is incorrect that Justice Scalia's assertion–about the constitutionality of prohibiting possession of firearms by felons–is unsupported. For instance, the Heller Court pointed out that
> the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.

128 S. Ct. at 2816 (citations omitted). Throughout the opinion, both the majority and dissents cited to numerous examples of valid limitations on the right to bear arms. Recalling this in-dept historical survey would be unnecessary for the purposes of this opinion, but suffice it to say that the Heller Court's statement about felons in possession of firearms was backed by ample support.

[5] "Dictum," the singular form of "dicta," is a shortened version of "obiter dictum," which is a Latin phrase often translated as "a remark by the way." Black's Law Dictionary 454 (6th ed. 1990).

4

> [w]hether the following provisions – D.C. Code §§ 7-2502.02(a)(4), 22-4504(a), and 7-2507.02 – violate the Second Amendment rights of individuals who are not affiliated with any state-regulated militia, but who wish to keep handguns and other firearms for private use in their homes?

District of Columbia v. Heller, __ U.S. __, 128 S. Ct. 645, 169 L. Ed. 2d 417 (2007). Thus, the Defendant is correct that Justice Scalia's statement about the viability of laws banning felons from possessing firearms did not necessarily fall within the scope of the particular controversy before the Heller Court. As such, it would meet the traditional definition of dicta, considering that it had no direct bearing on the Court's holding.

Courts generally treat dicta in case law as non-binding. See, e.g., Kelly v. Burks, 415 F.3d 558, 562 (6th Cir. 2005). It would be disingenuous, however, to claim that a clear statement of law from the highest court of the land, though announced in dicta, amounts to no more than a casual suggestion. Most federal circuits have recognized that "by the way" statements made by the Supreme Court resonate more forcefully than dicta from other sources. See, e.g., Pittsburg & Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1540 n.10 (10th Cir. 1995) (stating that "[f]ederal courts 'are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings'") (quoting City of Timber Lake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 557 (8th Cir. 1993)); United States v. Gaudin, 28 F.3d 943, 956 n.2 (9th Cir. 1994) (noting that Supreme Court dicta binds federal courts when uncontradicted by later opinions); United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993) ("Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when, as in this instance, badges of reliability abound."); Nichol v. Pullman Standard, Inc., 889 F.2d 115, 120 n.8 (7th Cir. 1989) (advising that courts should "respect considered Supreme Court dicta"); Donovan v. Red Star Marine Serv. Inc., 739 F.2d 774, 782 (2d Cir. 1984) (stating that "dicta of the

nation's highest Court merits the greatest deference"). Nonetheless, as illustrated in <u>Grutter v. Bollinger</u>, 288 F.3d 732 (6th Cir. 2002) (en banc), there is some disagreement within the Sixth Circuit as to how much weight the federal judiciary should afford to Supreme Court dicta. In upholding the affirmative action admission policies of the University of Michigan Law School, a majority of the appellate judges applied guidelines found in dicta in the decision of <u>Regents of the University of California v. Bakke</u>, 438 U.S. 265, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978). <u>Id.</u> at 745-46. In a footnote, former Chief Judge Boyce Martin noted that dicta "carries considerable persuasive authority" when derived from the only Supreme Court case to have addressed a particular issue. <u>Id.</u> at 746 n.9. He also commented that, faced with a novel issue of law, applying dicta from the Supreme Court "provide[d] a more appropriate basis for [the] opinion" than fashioning a new legal standard. <u>Id.</u> The dissent, on the other hand, took issue with what it referred to as the "Dicta Problem." <u>Id.</u> at 785-87 (Boggs, J., dissenting). Current Chief Judge Danny Boggs criticized the majority for importing certain aspects of <u>Bakke</u>, which he referred to as mere "persuasive authority," and stated that "the holding/dicta distinction demands that we consider binding only that which was necessary to resolve the question before the Court." <u>Id.</u> at 784 n.9, 787 (Boggs, J., dissenting).

While its legal potency may be debatable, citation to Supreme Court dicta for support is common practice in this circuit. <u>See, e.g.</u>, <u>Coles v. Granville</u>, 448 F.3d 853, 858 (6th Cir. 2006); <u>Bangura v. Hansen</u>, 434 F.3d 487, 501 (6th Cir. 2006). As such, the <u>Heller</u> Court's clear statement–that laws restricting gun possession by felons remain constitutionally sound–cannot be ignored.[6] 128 S. Ct. at 2816-17. This Court, at a minimum, will treat the <u>Heller</u> dicta as

---

[6]Presumably, the Supreme Court unanimously agrees on this point, considering that the four dissenters rejected the notion that the Second Amendment limits the authority of Congress to regulate possession of firearms for civilian purposes and would have upheld the Washington

6

"considerable persuasive authority." Grutter, 288 F.3d at 746 n.9.

Every appellate and district court opinion in the Sixth Circuit to have addressed the issue has found that Heller did not call into question the law against felons in possession of firearms. See United States v. Frazier, No. 07-6135, 2008 U.S. App. LEXIS 24023, 2008 WL 4949153 (6th Cir. Nov. 19, 2008); Hamblen v. United States, No. 3:08-1034, 2008 U.S. Dist. LEXIS 98682, 2008 WL 5136586 (M.D. Tenn. Dec. 5, 2008); United States v. Whisnant, No. 3:07-CR-32, 2008 U.S. Dist. LEXIS 76460, 2008 WL 4500118 (E.D. Tenn. Sept. 30, 2008); United States v. Henry, No. 08-20095, 2008 U.S. Dist. LEXIS 60780, 2008 WL 3285842 (E.D. Mich. Aug. 7, 2008). Moreover, federal courts throughout the United States have uniformly rejected this argument. See, e.g., United States v. Brunson, 292 Fed. App'x 259 (4th Cir. 2008); United States v. Gilbert, 286 Fed. App'x 383 (9th Cir. 2008); United States v. Irish, 285 Fed. App'x 326 (8th Cir. 2008); United States v. Radencich, 08-CR-00048(01)RM, 2009 U.S. Dist. LEXIS 3692, 2009 WL 127648, (N.D. Ind. Jan. 20, 2009); United States v. Borgo, No. 1:08-CR-81, 2008 U.S. Dist. LEXIS 86560, 2008 WL 4631422 (W.D.N.C. Oct.17, 2008); United States v. Li, No. 08-CR-212, 2008 U.S. Dist. LEXIS 97286, 2008 WL 4610318 (E.D. Wis. Oct. 15, 2008); United States v. Yancey, No. 08-CR-103, 2008 U.S. Dist. LEXIS 77878, 2008 WL 4534201 (W.D. Wis. Oct. 3, 2008); United States v. Burris, No. 1:07-CR-76; 2008 WL 4000635 (W.D.N.C. Aug. 26, 2008); United States v. Kilgore, No. 08-CR-66, 2008 U.S. Dist. LEXIS 69393, 2008 WL 4058020 (W.D. Wis. Aug. 26, 2008); Reynolds v. Sherrod, No. 08-CV-506, 2008 U.S. Dist. LEXIS 60456, 2008 WL 3287042 (S.D. Ill. Aug. 8, 2008); United States v. Robinson, No. 07-CR-202, 2008 U.S. Dist. LEXIS 60070, 2008 WL 2937742 (E.D. Wis. July 23, 2008). Given that the Defendant has submitted no precedent contradicting the

---

D.C. restrictions. Heller, 128 S. Ct. at 2824 (Stevens, J., dissenting).

overwhelming weight of authority holding that § 922(g)'s proscription survives <u>Heller</u>, the Court finds his argument that the Second Amendment invalidates this statute to be unavailing.

    II.    <u>Levels of Scrutiny Under an Equal Protection and Due Process Challenge</u>

Miller urges this Court to subject § 922(g) to a strict scrutiny standard of review. Invoking the Due Process and Equal Protections Clauses,[7] he argues that strict scrutiny is warranted because the statute: (1) invades the fundamental right to bear arms and (2) treats equally situated persons differently. (D.E. 3, Mot. to Dismiss, at 4-5.)

The Supreme Court previously has indicated that federal laws restricting gun ownership by felons do not violate the Due Process Clause outright. <u>Lewis v. United States</u>, 445 U.S. 55, 65-66, 100 S. Ct. 915, 63 L. Ed. 2d 198 (1980). It analyzed the firearm regulatory scheme under the rational basis test, finding that "[t]hese legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties." <u>Id.</u> at 65-66 n.8 (citing <u>United States v. Miller</u>, 307 U.S. 174, 178, 59 S. Ct. 816, 83 L. Ed. 1206 (1939)). The <u>Heller</u> Court, however, commented that these statements in the <u>Lewis</u>

---

[7]The Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. The Equal Protection Clause prevents denial of "equal protection under the law." U.S. Const. Amend. IV. These two provisions of the Constitution both stem from the "American ideal of fairness" and "are not mutually exclusive." <u>Bolling v. Sharpe</u>, 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954). While there is a great deal of overlap, these clauses may serve slightly different purposes, depending on the circumstances. Substantive Due Process generally provides a constitutional safeguard against arbitrary laws to all citizens, but Equal Protections ensures that a certain class, which might be as small as a single individual, will not be treated differently under the law from people similarly situated. As the Supreme Court noted, "'Due Process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated. 'Equal Protection,' on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable." <u>Ross v. Moffitt</u>, 417 U.S. 600, 609, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974).

opinion amounted to gratuitous dicta because a constitutional challenge under the right to bear arms "was not at issue and was not argued" in that case. Heller, 128 S. Ct. at 2816 n.25. Thus, the Defendant argues that this Court should consider, in light of recent Supreme Court precedent, the level of scrutiny applicable to federal laws restricting a Second Amendment liberty interest pursuant to a Due Process and Equal Protection challenge.

Generally, every duly enacted federal law is entitled to a presumption of constitutionality. Lockport v. Citizens for Cmty. Action at Local Level, Inc., 430 U.S. 259, 272-73, 97 S. Ct. 1047, 51 L. Ed. 2d 313 (1977). Under the rational basis test, a law will not be held unconstitutional unless no conceivable, legitimate basis rationally supports it. Trihealth, Inc. v. Bd. of Comm'rs, 430 F.3d 783, 790 (6th Cir. 2005). The law's legitimacy "may be based on rational speculation unsupported by evidence or empirical data." Id. (quoting FCC v. Beach Commc'ns, 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993)). The burden normally rests with the party challenging the law to show that it is "irrational." Id. (citing Warren v. City of Athens, 411 F.3d 697, 710, (6th Cir. 2005)).

The Supreme Court has recognized that "[t]here may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments." United States v. Carolene Prod. Co., 304 U.S. 144, 152, n. 4, 58 S. Ct. 778, 82 L. Ed. 1234 (1938). In cases where a party demonstrates that a law is facially suspect under the Constitution, the Supreme Court has fashioned two other tests, known as strict scrutiny and intermediate scrutiny. To satisfy the strict scrutiny test, a law must be "narrowly tailored to achieve a compelling governmental interest." Abrams v. Johnson, 521 U.S. 74, 82, 117 S. Ct. 1925, 138 L. Ed. 2d 285 (1997). Courts generally

9

apply strict scrutiny to laws that facially infringe on "fundamental constitutional rights" or prejudice the suspect classifications of race and national origin. See, e.g., San Antonio School District v. Rodriguez, 411 U.S. 1, 16-17, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). Intermediate scrutiny provides a less stringent standard, requiring that the suspect portions of the law only be "substantially related to an important government objective." Clark v. Jeter, 486 U.S. 456, 461, 108 S. Ct. 1910, 100 L. Ed. 2d 465 (1988). Courts have applied intermediate scrutiny to the classifications of sex and illegitimacy, as well as content neutral restrictions that incidentally burden free speech. Id.; see also United States v. Virginia, 518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996); Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 662, 129 L. Ed. 2d 497, 114 S. Ct. 2445 (1994). The difference between cases in which intermediate scrutiny is appropriate and those involving the higher standard of strict scrutiny is not abundantly clear.[8] Although, the distinction appears to turn on whether the challenged law: (1) burdens a right that is considered "fundamental"[9] or (2) burdens a suspect or quasi-suspect classification.

The Heller Court did not explicitly designate a level of scrutiny for evaluating Second Amendment restrictions. See Heller, 128 S. Ct. at 2821 (acknowledging the dissent's criticism of

---

[8]Justice Scalia has criticized the nebulous criteria for determining which test applies, quipping that the Supreme Court will apply strict scrutiny to "the deprivation of whatever sort of right [it] consider[s] 'fundamental'" and apply intermediate scrutiny "when it seems like a good idea to load the dice." United States v. Virginia, 518 U.S. at 567-68 (Scalia, J., dissenting).

[9]The Heller Court found an individual, as opposed to a collective, right to bear arms, 128 S. Ct. at 2797, but did not answer the question of whether the right was "fundamental." As Professor Erwin Chemerinsky has noted, "There are claims of individual rights under textual provisions of the Constitution which receive only rational basis review[,] . . . such as freedom of contract under the Due Process Clause." The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives, 73 Fordham L. Rev. 477, 484 (2004).

the majority for not adopting a level of scrutiny). The majority rejected the rational basis test, however, stating that it "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right," such as "the right to keep and bear arms." Id. at 2817 n.27. Thus, assuming that the majority did not fashion a new standard or abandon the "level of scrutiny" framework altogether, it must have found that either strict or intermediate scrutiny was appropriate.

The Defendant advocates strict scrutiny, arguing that the Heller Court declared the right to bear arms in self-defense to be a fundamental right. To the contrary, a close examination of Heller reveals that the Court never explicitly embraced or rejected the right to bear arms as "fundamental" under the Constitution.[10] Prior to Heller, the federal circuits consistently had found that the Second

---

[10] At the only portion of his opinion in which fundamental rights were mentioned, Justice Scalia noted the following:
> By the time of the founding, the right to have arms had become fundamental for English subjects. See [J. Malcolm, To Keep and Bear Arms,] 122-134 [(1994)]. Blackstone, whose works, we have said, "constituted the preeminent authority on English law for the founding generation," Alden v. Maine, 527 U.S. 706, 715, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999), cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen. See 1 Blackstone 136, 139-140 (1765).

Heller, 128 S. Ct. at 2798. As should be clear from the overall opinion, Justice Scalia's references to Blackstone and the law of England was meant to show the historical context in which the Second Amendment was drafted. It was not a definitive statement that the right to bear arms is "fundamental," as that term of art has been used in American constitutional jurisprudence. See United States v. Darrington, 351 F.3d 632, 635 (5th Cir. 2003) (stating that the judicial intent to classify an individual right as a "fundamental right" should be conveyed by explicit use of that precise constitutional terms of art). Merely because gun ownership carried significance among English subjects in the Eighteenth Century does not automatically compel the conclusion that the right to bear arms is "fundamental to the American scheme of justice." Benton v. Maryland, 395 U.S. 784, 795, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

11

Amendment's right to bear arms was not fundamental.[11] See, e.g., Olympic Arms v. Buckles, 301 F.3d 384, 388-89 (6th Cir. 2002) (observing that "Sixth Circuit precedent does not recognize a fundamental right to individual weapon ownership"); United States v. Hancock, 231 F.3d 557, 565-66 (9th Cir. 2000) (same); Gillespie v. City of Indianapolis, 185 F.3d 693, 709 (7th Cir. 1999) (finding that the right to possess a firearm is not fundamental); United States v. Toner, 728 F.2d 115, 128 (2d Cir. 1984) (stating that "the right to possess a gun is clearly not a fundamental right"); United States v. Synnes, 438 F.2d 764, 771 n.9 (8th Cir. 1971) (same).[12] Given the unanimous agreement among the federal circuits, as well as the Supreme Court's dicta in Lewis, 445 U.S. at 65-66 n.8, if the Heller Court had intended to overrule this long-standing consensus–that the right to bear arms under the Second Amendment should not be considered fundamental–it could have done so explicitly. Thus, the Defendant cannot invoke strict scrutiny through a fundamental rights theory.

Applying the process of elimination, only intermediate scrutiny remains, which the Court finds to be the appropriate standard. Other district courts considering this issue have reached a similar conclusion. See, e.g., United States v. Radencich, 3:08-CR-00048(01)RM, 2009 WL 127648, at *4 (N.D. Ind. Jan. 20, 2009); United States v. Schultz, No. 1:08-CR-75-TS, 2009 WL 35225, at *5 (N.D. Ind. Jan. 5, 2009); United States v. Bledsoe, No. SA08-CR-13(2), 2008 WL

---

[11]Even the state supreme courts that have recognized the right to bear arms have declined to apply strict scrutiny. See, e.g., Mosby v. Devine, 851 A.2d 1031, 1044 (R.I. 2004) (observing that no jurisdiction has applied strict scrutiny to the right to bear arms); State v. Cole, 665 N.W.2d 328, 337 (Wis. 2003) (same).

[12]Prior to Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007), the Fifth Circuit was the only federal circuit to interpret the Second Amendment as protecting the individual right to bear arms. United States v. Emerson, 270 F.3d 203 (5th Cir. 2001). The subsequent opinion in Darrington clarified, however, that Emerson was not intended to be an endorsement of the right to bear arms as "fundamental." Darrington, 351 F.3d at 635.

12

3538717 (W.D. Tex.. Aug. 8, 2008). Under the intermediate scrutiny test, the Court considers whether § 922(g) is "substantially related to an important government objective." Clark, 486 U.S. at 461. In its analysis, this Court will first consider whether the underlying policy objective of the statute is "important" and then whether the statute is "substantially related" to achieving such an goal. Id. While this standard still presents a significant hurdle, it is a less burdensome test for the Government to meet than strict scrutiny.

First, the purpose of the challenged statute is to prevent violent crime by curtailing the "easy availability of firearms . . . to those persons who pose a threat to community peace." Lewis, 445 U.S. at 66. The importance of crime prevention cannot be doubted, and it has been mentioned by courts in a variety of contexts. Cf. United States v. Salerno, 481 U.S. 739, 750-51, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987) (stating that the government interest of crime prevention is "both legitimate and compelling"); Tennessee v. Garner, 471 U.S. 1, 25-26, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (O'Connor, J., dissenting) (while commenting on a Fourth Amendment search and seizure law, observing that there is an "important public interest in crime prevention and detection and the nature and quality of the intrusion upon legitimate interests of the individual"); Hutchins v. District of Columbia, 188 F.3d 531 (D.C. Cir. 1999) (finding that "reducing juvenile crime and victimization is an important government interest"). Specifically, the harm caused by gun violence in this country has been well-documented, and government efforts to curtail this threat have a direct impact on domestic security. See, e.g., BJS's Federal Justice Statistics Program, Department of Justice, Firearm Deaths by Intent from the Vital Statistics, available at http://www.ojp.usdoj.gov/bjs/glance/tables/frmdth.htm (stating that there were 374,444 intentional deaths attributable to firearms from 1991 to 2001); BJS's Special Report, Weapon Use and Violent

Crime (September 2003), available at http://www.ojp.usdoj.gov/bjs/pub/pdf/wuvc01.pdf (finding that, between 1993 and 2001, firearms were used in 27% of robberies, 8% of assaults, and 3% of rapes and sexual assaults, and also that "U.S. residents were victims of crimes committed with firearms at a[n] annual average rate of 4 crimes per 1,000 persons age 12 or older"); see also Heller, 128 S. Ct. at 2855-57 (Breyer, J., dissenting) (discussing statistics related to gun violence). As such, the government objective promoted by these laws is not only "legitimate," see Lewis, 445 U.S. at 66, but also "important," Clark, 486 U.S. at 461.

Second, the Court finds that the relationship between violent crime and felons possessing guns to be substantial. The Supreme Court has noted that, when enacting the law, "Congress focused on the nexus between violent crime and the possession of a firearm by any person with a criminal record." Lewis, 445 U.S. at 66 (citing 114 Cong. Rec. 13220, 16298 (1968) (remarks of Sen. Tydings and Sen. Pollock)). In light of this, Congress concluded that felons are more disposed to commit crimes than non-felons. While this legislative determination is arguably grounded in a broad generalization, the nature of the threat posed by gun violence makes narrowing the scope of gun regulation impracticable.[13] Also, because the government objective is exceptionally compelling in this area, Congress must have wider latitude to combat the great social harm inflicted by gun violence. Given the noted connection between previous felony convictions and the propensity for

---

[13] One commentator has observed that "most legislation will assert broad safety concerns and broad gun control measures to match, covering both 'good' and 'bad' gun possessors and 'good' and 'bad' guns. Such legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent guns." Donald Dowd, The Relevance of the Second Amendment to Gun Control Legislation, 58 Mont. L. Rev. 79, 111 (1997). Additionally, Professor Winkler has noted that "due to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches. To expect such legislation to reflect a tight fit between ends and means is unrealistic." Adam Winkler, Scrutinizing the Second Amendment, 105 Mich. L. Rev. 683, 731 (2007).

crime, this Court agrees that laws barring possession of firearms by felons are substantially related to crime prevention. Schultz, 2009 WL 35225, at *5. Although prohibiting gun possession by nearly all felons might not be the most precisely focused means to achieve this end,[14] intermediate scrutiny, by definition, permits Congress to paint with a broader brush. Thus, the Court rejects the Defendant's argument that § 922(g) deprives him of a Second Amendment liberty interests in violation of the Due Process and Equal Protection Clauses.

III.     Whether Differential Treatment Toward the Defendant Offends Equal Protection

The Defendant also argues that § 922(g) is unconstitutional because it treats certain felons differently from others similarly situated.[15] Specifically, the Defendant notes that his previous felony convictions consisted of possession with intent to distribute, and manufacturing of controlled substances. He argues that, because others convicted of drug misdemeanors do not void their rights to bear arms, the law unfairly singles him out. In support of this position, he principally relies on

---

[14]The Defendant argues that "[a] blanket prohibition on felons possessing firearms in their homes for self-defense or protection of their families is not . . . narrowly tailored because there could be less restrictive means of achieving" the government objective. (D.E. 3, Mot. to Dismiss, at 3.) Even assuming this point to be true, the mere fact that some legitimate conduct falls within the scope of the prohibition would not necessary cause the statute to fail under the intermediate scrutiny standard. To find otherwise would blur the line between strict and intermediate scrutiny.

[15]To the extent the Defendant asserts that felons should be treated as a suspect class under the Equal Protection Clause, the Court rejects this notion and has found no law to support it. See, e.g, Baer v. Wauwatosa, 716 F.2d 1117, 1125 (7th Cir. 1983) (stating that "felons are not yet a protected class under the Fourteenth Amendment") (citing United States v. Harris, 537 F.2d 563, 564 n.2 (1st Cir. 1976)); United States v. Alamillo, 754 F. Supp. 827, 829 (D. Colo. 1990) (stating that "persons with felony convictions . . . clearly not a suspect classification within Equal Protection analysis"); Carbonaro v. Reeher, 392 F. Supp. 753, 757 (E.D. Pa. 1975) (rejecting the notion that felon status qualifies as a suspect classification); see also Frontiero v. Richardson, 411 U.S. 677, 686, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973) (explaining that sex is a suspect classification because, like race and national origin, it is an "immutable characteristic determined solely by the accident of birth").

the older case of Skinner v. Oklahoma, 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942), in which the Supreme Court held that Oklahoma's Habitual Criminal Sterilization Act, which authorized the sterilization of people convicted of certain felonies, violated the Equal Protection Clause.

The defendant in Skinner was convicted twice of robbery with a firearm and once for stealing chickens, which made him eligible for sterilization under state law. Id. at 537. After a trial instituted by the Oklahoma attorney general, a state jury found that a vasectomy could be performed on Skinner involuntarily. Id. The Supreme Court considered whether this procedure violated equal protection because others convicted of similar crimes were not subject to sterilization. Id. at 538. In its analysis, the Court commented on the negligible difference between the classes of crimes that would subject a felon to sterilization and those that would not. Id. at 538-39. For example, someone with three chicken-thieving convictions could have been sterilized, but the same punishment was not available for a three-time embezzler. Id.

However, it was not simply the unequal treatment of chicken thieves that ultimately led the Court to hold that the Oklahoma law ran afoul of the Equal Protection Clause. To the contrary, the Skinner Court explicitly stated that disproportionate punishment for similar criminal offenses, by itself, would not offend the Constitution, noting that "a State is not constrained in the exercise of its police power to ignore experience which marks a class of offenders or a family of offenses for special treatment. Nor is it prevented by the equal protection clause from confining 'its restrictions to those classes of cases where the need is deemed to be clearest.'" Id. at 540 (quoting Miller v. Wilson, 236 U.S. 373, 384, 35 S. Ct. 342; 59 L. Ed. 628 (1915)). The Court then stated that Skinner was an exceptional case because it involved a challenge to legislation restricting "one of the basic

16

civil rights of man," i.e. procreation. Id. at 541.

The holding in Skinner rested not only on the difference in treatment between people convicted of similar crimes, but also on the fact that the legislation in question deprived certain individuals of a "basic liberty." Id.; see also Carey v. Population Serv. Int'l, 431 U.S. 678, 685, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1976) (stating that the "decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices") Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) (noting that the "rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights of man,' and 'rights far more precious . . . than property rights,'") (citations omitted). In fact, the first sentence of the opinion reads, "This case touches a sensitive and important area of human rights." Skinner, 316 U.S. at 536. Thus, Skinner is distinguishable from the present case because, as noted above, the Constitution does not place the right to bear arms on equal footing with fundamental rights, such as the right to bear children. See, e.g., Olympic Arms, 301 F.3d at 388-89. As such, the Defendant's equal protection challenge fails for the same reasons stated supra in section II.

## CONCLUSION

For the reasons articulated herein, the Court **DENIES** the Defendant's motion to dismiss the indictment.

IT IS SO ORDERED this 26th day of February, 2009.

            s/ J. DANIEL BREEN
            UNITED STATES DISTRICT JUDGE